## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 2:21-cv-1434-RJC |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| MICHAEL K. HERRON, | ) | |
| | ) | |
| Appellee. | ) | |

| | | |
|---|---|---|
| MICHAEL K. HERRON, | ) | |
| | ) | No. 2:21-cv-1435-RJC |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee. | ) | |

## OPINION

Debtor Michael K. Herron and creditor United States of America each appeal aspects of the Bankruptcy Court's treatment of the federal government's tax lien. In an adversary proceeding filed by Herron incidental to his Chapter 11 restructuring, the Bankruptcy Court determined that the federal government's claim for unpaid taxes was neither time-barred nor dischargeable but that the government's tax lien could be stripped from various interests of Herron in real property and stripped down to the value of his equity in three properties. The Court holds that the Bankruptcy Court properly determined that the federal claims were not time barred and were not dischargeable; however, the Bankruptcy Court improperly stripped the government's tax lien. Accordingly, this Court will affirm the judgment of the Bankruptcy Court in part, reverse it in part, and remand these two cases for further proceedings consistent with this opinion.

I.      **BACKGROUND**[1]

Herron is a radiologist.  He holds a doctor of medicine degree and masters degrees in public and business administration.  In 2006, four years into his post-residency career as a radiologist, Herron opened an imaging practice with several partners.  However, his practice was negatively impacted by the 2008 financial crisis.  Despite the negative impact, the practice stayed in business.

Sometime in 2009, Herron spoke to Phil Price, his accountant, about his taxes.  Price suggested that Herron file amended tax returns for prior years seeking refunds based on a tentative carryback claim.  With Herron's aquiescence, Price apparently filed tentative carryback claims on September 7, 2009 for tax years 2004–07.  Shortly thereafter, the IRS issued refunds for those years totaling $345, 041.42.

Herron is also involved in real estate.  As of his bankruptcy petition date, he owned 12 parcels of real estate located in Florida, Pennsylvania, Louisiana, and Maryland.  The status of six of those properties form the basis for the pending dispute.

Herron filed his voluntary bankruptcy petition on November 21, 2019, seeking the protections of a reorganization under Chapter 11 of the Bankruptcy Code.  On February 11, 2020, the IRS filed a proof of claim asserting a secured claim of $867,570.25 owing for tax years 2004–08 and 2010–12 and an unsecured claim of $77,208.70 for tax years 2011–12—in total, $944,778.95.

Herron filed an adversary proceeding on August 31, 2020 challenging the IRS's claim.  The 11-count amended complaint: sought to disallow the claim for taxes respecting the years 2004–08 as time-barred (Count I); sought to avoid various tax liens based on the improper filing

---

[1] The facts in this section are drawn from the opinion below and are not in dispute.  *See* Memo Op.

of certain documents (Count II); sought a declaration that the IRS's claim for unpaid taxes was dischargeable (Count III); and sought to strip the IRS's liens from eight parcels of real property (Counts IV–XI).

On September 14, 2020, the IRS filed an amended proof of claim. The amended proof of claim reduced the IRS's secured claim to $518,691.13 for tax years 2008 and 2010–12 and increased its unsecured claim to $426,087.82 for tax years 2004–07 and 2011–12. The IRS then answered the complaint and, soon after, moved for summary judgment, arguing in part that judgment in its favor was proper on Count II of the complaint on the basis that it was no longer asserting a secured claim for tax years 2004–07. The Bankruptcy Court granted summary judgment on Count II for the IRS on that basis but otherwise denied the motion.

Meanwhile, the main Chapter 11 case marched on. Two parcels of land, the subjects of Counts V and IX of the amended complaint, were sold. As part of the sale, the bankruptcy court ordered that any liens on those properties were transferred to the proceeds of the sales. The bankruptcy court determined that those Counts were mooted by the sales, because the IRS liens attaching to the proceeds from the sales were not before that court. Another parcel was the subject of a settlement between Herron and a creditor, mooting Count IV.

Ultimately, Herron proposed a Second Amended Chapter 11 Plan of Reorganization on December 15, 2020. That Plan and its accompanying disclosure indicated that Herron would make payments on the IRS's claims subject to a "determination of the secured status and dischargeability" of those claims. App'x to Appellant United States of Am.'s Br., Ex. 10 § 4.6, No. 2:21-cv-1434-RJC (ECF No. 13-11) ("Chapter 11 Plan"). The Plan was approved, without objection, on January 22, 2021. App'x to Appellant United States of Am.'s Br., Ex. 11 at 1–2 (ECF No. 13-12).

3

On June 1, 2021, the bankruptcy court held a trial on the extant counts of Herron's Amended Complaint in the adversary proceeding.  *See* App'x to Br. of Appellant United States of Am., Ex. 12, No. 2:21-cv-1434-RJC (ECF No. 13-13).  Following the trial, the parties submitted post-trial briefing and, on July 15, 2021, presented closing arguments.  *See* App'x to Br. of Appellant United States of Am., Ex. 13, No. 2:21-cv-1434-RJC (ECF No. 13-14).  On October 5, 2021, the Bankruptcy Court issued its opinion.  *See* App'x to Br. of Appellant United States of Am., Ex. 1, No. 2:21-cv-1434-RJC (ECF No. 13-2) ("Memo. Op.").  That opinion made three principal holdings, now the subject of this appeal.

First, respecting Count I, the Bankruptcy Court found that the IRS's claims were not time barred.  It rejected Herron's theory that the collection of taxes for a given year was subject to a single 10-year statute of limitations beginning when the initial return for that year is filed.  Memo. Op. at 12–13.  Both Herron and the bankruptcy court framed the IRS's 2013 assessments of deficient taxes for the years 2004–07 as "supplemental assessments."  *Id.* at 13.  Using this framing, the bankruptcy court found that Herron had advanced no convincing statutory or policy argument for ignoring the IRS's good faith supplemental assessment of taxes to recover erroneous refunds attributable to Herron's tentative carryback claims.  *Id.* at 13–14.

Second, respecting Count III, the Bankruptcy Court found that Herron had willfully evaded paying his taxes.  In finding that Herron acted willfully, the bankruptcy court relied on Herron's educated status including graduate degrees in business and public administration, various luxury expenses, and the proceeds of a settlement that he received but did not use to pay his tax debts.  *Id.* at 24.  Because he had willfully evaded his tax debts, those debts were not dischargeable under the bankruptcy code.  *Id.* at 25.

Finally, respecting Counts VI, VII, VIII, X, and XI, the bankruptcy court modified the IRS's lien to account for Herron's equity, or lack thereof, in the properties listed in those counts. For the properties identified in Counts X and XI, higher priority claims exceeded their value, leaving Herron with no equity remaining to support the IRS's lien. *Id.* at 26, 38. Accordingly, the IRS stripped the lien off of those properties. *Id.* at 38. After accounting for higher priority claims, Herron had $279,297.42 in equity remaining in the three properties identified in Counts VI, VII, and VIII, all located on Chesterfield Road. *Id.* The bankruptcy court found that this was the only value left to support the IRS' lien, so it stripped that lien down to the value of Herron's equity in the Chesterfield Road properties. *Id.* at 37–38.

On the same day as its opinion, the bankruptcy court entered judgment in the adversary proceeding. Judgment, *Herron v. Int. Rev. Serv.*, No. 20-2131-JAD (Oct. 5, 2021) (ECF No. 93). The parties each appealed aspects of the judgment to this Court. Not. of Appeal from Bankruptcy Ct., No. 2:22-cv-1434-RJC (ECF No. 1); Not. of Appeal from Bankruptcy Ct., No. 2:22-cv-1435-RJC (ECF No. 2). This Court has jurisdiction over this appeal under 28 U.S.C. § 158(a).

## II.     LEGAL STANDARD

This Court reviews the bankruptcy court's findings of historical fact and inferences drawn from those facts for clear error. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3d Cir. 1989). This Court conducts a plenary review of the bankruptcy court's legal conclusions. *Id.* In the case of mixed questions of law and fact, this Court separates out the factual and legal components and applies the relevant standard of review to each. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981). "While the underlying basic and inferred facts require clear-error review, the culminating determination of whether those facts support a conclusion . . . gets plenary review as 'essentially[ ] a conclusion of law.'" *In re LTL Mgmt., LLC*, 64 F.4th 84, 100 (3d Cir. 2023) (quoting *In re 15375 Mem. Corp. v. BEPCO, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009)).

Finally, "[t]he Court can affirm the correct decision of a lower court on grounds different than those relied upon by that court," including "any basis for which it finds support in the record." *In re Izzi*, 295 B.R. 754, 757–58 (E.D. Pa. 2003) (citing *Narin v. Lower Merion Sch. Dist.*, 206 F.3d 323, 333 n.8 (3d Cir. 2000), *Bernitsky v. United States*, 620 F.2d 948, 950 (3d Cir. 1980)).

## III.    DISCUSSION

This appeal presents three issues, which the Court addresses in the following order: (1) whether the bankruptcy court correctly determined that the government's claims for unpaid federal taxes were not time-barred; (2) whether the bankruptcy court erred in finding that the government's federal tax claims were excepted from discharge because Herron willfully attempted to evade federal taxes; (3) whether the bankruptcy court permissibly stripped the government's federal tax lien from certain parcels or real property.

### A.    The Government's Tax Claims Were Not Time-Barred

Herron argues that the government should be barred from pressing its claims for unpaid federal income tax for the years 2004–08 because the 10-year statute of limitations applicable to such claims under 26 U.S.C. § 6502 had elapsed by the time he filed for bankruptcy.  Appellant's Br. at 10, No. 2:21-cv-1435-RJC (ECF No. 13) ("Herron's Opening Br.").  The bankruptcy court erred, he says, by finding that the government was entitled to new 10-year terms within which to collect the unpaid taxes as of its 2013 assessment of taxes for years 2004–08, based on the language of 26 U.S.C. § 6204.  *Id.*  That statute permits the IRS to "make a supplemental assessment whenever it is ascertained that any assessment is imperfect or incomplete in any material respect." 26 U.S.C. § 6204(a).

According to Heron, the bankruptcy court's holding would allow the IRS to perpetually extend its time to assess and file taxes based only on a determination that, for example, a prior

assessment was incomplete because interest had accrued. Herron's Opening Br. at 13–14. But a close examination of the record and the relevant provisions of the Internal Revenue Code reveals that the IRS's claims for taxes owed for the years 2004–08 were not time barred without reference to the statutory authority for supplemental assessments.

Begin with the time permitted for the IRS to assess deficient taxes: the IRS must assess taxes owed for a given year within three years after the filing of the return for that year. 26 U.S.C. § 6501(a). However, as the government points out, the Internal Revenue Code provides various extensions of the time to assess taxes for a given year. Perhaps the most straightforward is an extension by agreement; subject to certain requirements not relevant here, the IRS and a taxpayer may agree to an extension of the period during which taxes may be assessed for a given year. 26 U.S.C. § 6501(c)(4)(A).

Here, that is precisely what led to the IRS's 2013 assessment of taxes owed for tax year 2008. Those taxes would ordinarily have been time barred if assessed after 2012 (assuming that the return for Herron's 2008 taxes was filed in 2009). However, Herron extended the time for assessing those taxes by agreement with the IRS. Memo. Op. at 16 n.6. Accordingly, that assessment was not time barred.

Slightly more complicated is the extension caused by the application of a capital loss carryback. Under the Code, a taxpayer can apply a capital loss in one year to offset capital gains in a prior year (called a carryback adjustment or carryback claim). *Duquesne Light Holdings, Inc. & Subsidiaries v. Comm'r of Int. Rev.*, 861 F.3d 396, 416 (3d Cir. 2017). If a taxpayer receives a refund based on the tentative carryback adjustment, the Code allows the IRS to assess taxes for deficiencies caused by the carryback during the period in which taxes may be assessed for the year in which the loss occurred:

> In the case of a deficiency attributable to the application to the taxpayer of a net operating loss carryback or a capital loss carryback (including deficiencies which may be assessed pursuant to the provisions of section 6213(b)(3)), such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the net operating loss or net capital loss which results in such carryback may be assessed.

26 U.S.C. § 6501(h).  *See also* 26 U.S.C. § 6501(k).

If that statutory language appears convoluted, its meaning is straightforward: the time during which the IRS may assess taxes that are owed due to a refund following an erroneous carryback application is measured from the year in which the person filed the return applying the carryback, and not from the year to which the carryback offset is applied.  *Duquesne Light*, 861 F.3d at 416.  For example, where a taxpayer filed a return in 1975 (for tax year 1974) and, in that return, applied capital losses that occurred in 1974 to offset capital gains that occurred in tax year 1972, the IRS's 1978 notice of deficiency for taxes owed for tax year 1972 due to the carryback was timely.  *First Chicago Corp. v. C.I.R.*, 742 F.2d 1102, 1101–03 (7th Cir. 1984) (per curiam). The time for the IRS to assess taxes for tax year 1972—which would normally have expired by 1976—had been extended to 1978 by the application of capital losses to 1972 on the return filed in 1975.  *Id.*

The carryback provisions of the Code provide "three alternative remedies for the IRS to recover such erroneously allowed tentative [net operating loss] carryback refunds: (1) the IRS may summarily assess a deficiency attributable to a tentative carryback adjustment as if due to a mathematical or clerical error appearing on the tax return pursuant to 26 U.S.C. § 6213(b)(3); (2) a civil action may be brought in the name of the United States to recover the erroneous refund pursuant to 26 U.S.C. § 7405; or (3) the IRS may issue a statutory notice of deficiency under 26 U.S.C. § 6212 and thereby subject the refund to the usual tax deficiency procedures, including review by the Tax Court, prescribed by 26 U.S.C. § 6211–6215."  *In re Williams*, No. 2:12-bk-

15652-RK, 2019 WL 1757115, at *4 (Bankr. C.D. Cal. Apr. 8, 2019).  A notice of deficiency from the IRS tolls the statute of limitations on assessments.  26 U.S.C. § 6503(a)(1); *see Highland Supply Corp. & Subsidiaries v. United States*, Case No. 18-cv-1417-NJR-RJD, 2019 WL 5391449, at *3 (S.D. Ill. Oct. 22, 2019) (collecting cases).

Here, the government contends, and Herron does not contest, that the IRS filed a notice of deficiency and then, in 2013, timely assessed taxes for the years 2004–07 based on amended returns applying a capital loss carryback to those years.  Br. of Appellee United States at 13–14, No. 2:21-cv-1435-RJC (ECF No. 15).  In 2009, Herron filed amended returns claiming a carryback for capital losses to be applied to the tax years 2004–07.  Under Section 6501(h), that filing extended the time for the IRS to assess taxes for those years.  In 2013, after issuing a notice or deficiency and receiving no response, the IRS assessed taxes for the years 2004–07.  That assessment was timely because it, or at least the notice of deficiency, occurred within the extended period for assessing deficiencies attributable to a carryback provided by section 6501(h).

Importantly, Herron did not challenge the timeliness of the IRS's assessments of taxes.  Memo. Op. at 16 n.6.  Accordingly, he could not challenge the timeliness of the assessments before this Court.  *See Buncher Co. v. Official Comm. Of Unsecured Creditors of GenFarm Ltd., P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000) (issues not raised before the bankruptcy court are waived).  Moreover, the bankruptcy court found that the IRS's assessments for deficiencies attributable to the carryback applications for tax years 2004–08 were timely under the "uncontested statutory authority" just described.  Memo. Op. at 16 n.6.

Though they are not the subject of Herron's challenge, the Court addressed the IRS's authority for the assessments because those assessments are relevant to a second limitations period.  The timely assessment of taxes triggers a 10-year statutory limitations period within which the IRS

may collect deficient taxes, either by levy or by a proceeding in court.  26 U.S.C. § 6502(a).  It is this second limitations period that Herron challenges.

Herron argues, as he did below, that the "supplemental" assessments made by the IRS in 2013 could not restart the 10-year limitations period for collections, which is triggered by the original assessment of taxes following the filing of returns for a given tax year.  Herron's Opening Br. at 13–14.  But the IRS did not make supplemental assessments in this case, it made assessments of taxes attributable to a tentative carryback claim, so Herron's focus on that statute is misplaced.  The plain language of sections 6501(h) allowed the IRS to make assessments for the years 2004– 07 based on Herron's 2009 tentative carryback claim for those tax years.  A contrary holding would allow taxpayers to circumvent the IRS's ability to recover improperly distributed by delaying their filing of a tentative carryback claim.  The Court cannot reasonably conclude that Congress enacted such a scheme.

The IRS's 2013 assessments triggered the 10-year limitations period for collections.  The IRS could therefore institute proceedings to collect the taxes owed for 2004–07 any time before 2023.  Likewise, the IRS could institute proceedings to collect the taxes owed for 2008, which it assessed by agreement in 2013, during the same period.  And it indisputably did so, as it filed its proof of claim in 2020.  Accordingly, the Court holds that the timely assessment of taxes attributable to a carryback application, as contemplated by sections 6501(h), triggers a new 10- year limitations period for collections under section 6502(a).[2]

---

[2] While Herron challenged the Bankruptcy Court's determination that the IRS's claims were timely in his opening brief, he did not respond to the government's arguments or otherwise maintain his challenge in his reply.  *See generally* Appellant's Reply Br., No. 2:21-cv-1435-RJC (ECF No. 17).  Accordingly, he abandoned this issue.  *See In re Pappas*, 239 B.R. 448, 460 (E.D.N.Y. 1999) ("Appellant apparently abandoned this argument by the time her reply brief was filed.  In the short, eight-page reply brief, Appellant failed to address this issue, and also failed to respond to the Appellee's arguments in opposition to her position.")  Nonetheless, the Court agrees

### B.    The Government's Tax Claims Were Not Dischargeable in Bankruptcy.

Herron also argues that the bankruptcy court improperly found that his tax debts were not dischargeable because he had willfully avoided paying his income taxes.  Herron's Opening Br. at 7–8.  He says that the Bankruptcy Court inappropriately relied on various facts in the record, including his high level of education, various expenses he made on trips, and his use of settlement proceeds he received to establish that he had acted willfully.  *Id.* at 8–9.

The confirmation of a plan of reorganization under Chapter 11 of the Bankruptcy Code results in the discharge of all debts that preceded the filing of the bankruptcy petition, except as provided in the plan.  11 U.S.C. § 1141(d)(1)(A).  Discharge of these debts furthers the Bankruptcy Code's policy "to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"  *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

But this so-called "fresh start" policy is not without limits: the Code excepts certain debts where they are not owed by an "honest but unfortunate debtor."  *Id.* at 287 (quoting *Local Loan*, 292 U.S. at 244).  As relevant here, a debt for a "tax or customs duty" is not dischargeable where "the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).  "The plain language of the second part of § 523(a)(1)(C) comprises both a conduct requirement (that the debtor sought 'in any manner to evade or defeat' his tax liability) and a mental state requirement (that the debtor did so 'willfully')."  *In re Fegeley*,

---

with the bankruptcy court that the IRS timely pursued its claims for unpaid taxes for the years 2004–08.

118 F.3d 979, 983 (3d Cir. 1997) (quoting *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996)) (cleaned up).

The ways by which a taxpayer may willfully evade or defeat a tax are legion. "'Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation.'" *Id.* (quoting *Dalton*, 77 F.3d at 1301). However, "a debtor's failure to pay his taxes, alone, does not fall within the scope of [§ ]523(a)(1)(C)'s exception to discharge in bankruptcy." *In re Haas*, 48 F.3d 1153, 1158 (11th Cir. 1995). Instead, "nonpayment of taxes" is "'relevant evidence which [courts] should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes.'" *Fegeley*, 118 F.3d at 983 (quoting *Dalton v. Int. Rev. Serv.*, 77 F.3d 1297, 1301 (10th Cir. 1996)).

The Third Circuit has interpreted the requirement that a tax be evaded or defeated "willfully" in § 523(a)(1)(C) to mean that the acts were "voluntary, conscious, and intentional:"

> The majority of courts to address this issue . . . have adopted the test for "civil willfulness." In doing so, they "have interpreted 'willfully,' for purposes of § 523(a)(1)(C), to require that the debtor's attempts to avoid his tax liability were 'voluntary, conscious, and intentional.'"

*Fegeley*, 118 F.3d at 984 (quoting *Birkenstock*, 87 F.3d 952). A debtor therefore willfully evades a tax where she has a duty under the tax laws, knows she has that duty, and voluntarily and intentionally violates that duty. *Id.*

The bankruptcy court relied on a range of facts in finding that Herron willfully evaded a tax. For example, while not dispositive, the bankruptcy court considered that Herron is highly educated—in addition to being a physician, he possesses graduate degrees in business and public administration. Herron objects to the bankruptcy court's reliance on these facts, arguing that his

status as a radiologist and naval reservist do not "suggest any propensity for willful deception."
Herron's Opening Br. at 7.

Herron cites no authority for a categorical bar on the consideration of a tax debtor's level
of education in support of a finding of willfulness. More to the point, a tax debtor's high education
level, while not on its own sufficient to support a willfulness finding, is highly relevant
circumstantial evidence of her ability to understand and violate a tax duty. *See United States v.
Neumann*, No. 21-CR-439-01 (NSR), 2023 WL 8700974, at *7 (S.D.N.Y. Dec. 14, 2023)
("[E]vidence of a defendant's background and prior adherence to the tax laws is relevant to proving
willfulness in committing tax crimes."); *United States v. Gilmartin*, 684 F. App'x 8, 11 (2d Cir.
2017) ("The record is replete with evidence of Gilmartin's advanced education level, history of
filing valid tax returns, and knowledge of case law that rejected his theory of tax liability."). That
is particularly so where the debtor possesses advanced credentials in business. *See United States
v. MacKenzie*, 777 F.2d 811, 818 (2d Cir. 1985) ("Defendants' backgrounds (each had a college
degree, Roderick in economics and Malcolm in business) also demonstrate the likelihood they
knew what the law required.")

The bankruptcy court also considered various luxury purchases that Herron made and
vacations that Herron went on with his now-wife. On this score, Herron argues that his luxury
expenditures "appear to have been overblown." Herron's Opening Br. at 7. Herron points out
what he says are certain inconsistencies in the record about two rings that he purchased for his
wife. *Id.* at 8–9. He claims that only purchased one ring, worth $3,500, and that the IRS concocted
a second ring, worth $18,000, from whole cloth. *Id.* But Herron ignores that his own testimony
established his purchase of two rings, one valued at $3,500 and another, an engagement ring,
valued at $18,000. Memo. Op. at 20–21 & n.8. Thus, he has not shown that the bankruptcy court

13

clearly erred in finding that he made unnecessary luxury purchases. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) ("If the [fact-finding] court's account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." citing *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949)). The bankruptcy court's findings respecting Herron's luxury purchases were, at minimum, plausible— if not perfectly reasonable; this Court will not disturb them.

Moreover, even if the bankruptcy court overestimated the value of Herron's luxury purchases, its chief concern was his use of an $800,000 settlement from litigation with his former business partners to purchase a new home. Memo. Op. at 22–23. Important to the bankruptcy court, Herron purchased that home in cash using the settlement proceeds rather than seeking traditional financing through a mortgage. *Id.*

Herron says that he purchased the new home because his old one had been condemned due to hurricane damage and he objects that the bankruptcy court still weighed his use of the settlement proceeds against him despite that fact. Herron's Opening Br. at 9–10. But the bankruptcy court did consider the provenance of his need for a new home. Memo. Op. at 22. It also considered that the record did not disclose what he did with the entire $800,000: his new home was worth $344,976, and $200,000 was used for attorney fees, leaving more than $250,000 unaccounted for. *Id.* Though the record did not disclose what Herron did with that money, the bankruptcy court found that it was not used for to pay his outstanding tax debts. *Id.* at 22–23. This Court finds no error in the bankruptcy court's conclusion that Herron's failure to put even that remainder toward paying his taxes was anything other than willful evasion.

14

Lastly, Herron emphasizes that he submitted several offers in compromise in an attempt to settle his debt with the IRS.  Herron's Opening Br. at 10–11.  The bankruptcy court found that Herron had not sufficiently fleshed out those offers in compromise and that they therefore did not excuse his conduct.  Memo. Op. at 25.  Herron suggests that the bankruptcy court erred by drawing "adverse inferences" against him based on an "absence of evidence."  Herron's Opening Br. at 10.

But it was Herron's burden, under the applicable burden-shifting regime, to produce some competent evidence of his good faith.  *See* Memo. Op. at 24 (collecting cases).  Moreover, far from being evidence of a taxpayer's good faith, Court's have found that the submission of offers in compromise may satisfy the conduct requirement for purposes of a criminal conviction for willful tax evasion.  *See, e.g.*, *United States v. Miller*, 520 F.3d 504, 509–10 (5th Cir. 2008) (finding sufficient evidence to sustain a conviction for willful evasion of taxes where taxpayer made an offer in compromise to settle tax debt for $7,500 despite having approximately one million in overseas account).  Herron pointed to nothing about these offers in compromise to demonstrate his good faith and, given all the evidence in the record, the Court is convinced that the bankruptcy court correctly weighed all of the evidence before it in finding that Herron acted willfully.

### C.    The Bankruptcy Court Improperly Stripped the Government's Tax Lien.

The Court turns now to the bankruptcy court's treatment of the IRS's federal tax lien.  Both parties have objections here.  The government objects to the bankruptcy court's decision to strip its lien off of two of Herron's properties and down to the value of his equity in the Chesterfield Road properties.  Herron objects to the bankruptcy court's decision to treat all three Chesterfield Road properties as a unit for purposes of determining the value of his equity in those properties.

The Tax Code grants the IRS a lien on a person's property interests when that person fails to pay a tax debt.  26 U.S.C. § 6321.  The scope of the lien is broad; it extends to "all property and

rights to property, whether real or personal, belonging to" the tax debtor.  *Id.*  Indeed, it is so broad

that it attaches "to all property of a taxpayer without limitations or exemptions" whether or not the

property is itself exempted from the scope of divestment by levy.  *Popky v. United States*, 326 F.

Supp. 2d 594, 604 (E.D. Pa. 2004).

The bankruptcy court altered the IRS's lien through a procedure called lien stripping.  Lien

stripping refers to a process by which a party's claim, secured by some collateral, is deemed not

secured by that collateral in whole or in part.  *In re Johnson*, 386 B.R. 171, 173 (Bankr. W.D. Pa.

2008).  Put another way, the collateral is deemed to be unencumbered by the lien.  There are two

species of lien stripping:  A lien that is wholly removed from collateral that has no value remaining

after higher priority claims are considered is "stripped off" of that collateral.  *Id.*  A lien that is

reduced to the value remaining after higher priority claims are considered is merely "stripped

down."  *Id.*

Lien stripping conventionally derives from the interaction of two provisions of the

Bankrtupcy Code.  *See In re Dever*, 164 B.R. 132, 134 (C.D. Cal. 1994) (describing the

conventional basis for lien stripping).  Section 506(a) of the Code provides in pertinent part that

> An allowed claim of a creditor secured by a lien on property in
> which the estate has an interest . . . is a secured claim to the extent
> of the value of such creditor's interest in the estate's interest in such
> property, . . . and is an unsecured claim to the extent that the value
> of such creditor's interest . . . is less than the amount of such allowed
> claim.

11 U.S.C. § 506(a)(1).  Under that provision, "'a creditor that has an allowed claim on collateral

with a value less than the amount owed on that claim holds two claims: a secured claim equal to

the value of the collateral, and an unsecured claim for the excess of the claim over the value of the

collateral.'"  *Dever*, 164 B.R. at 134 (quoting *In re Midway Partners*, 995 F.2d 490, 494 (4th Cir.

1993)).

Meanwhile, section 506(d) of the Code provides that "[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void" subject to exceptions not relevant here. 26 U.S.C. § 506(d). Read together with section 506(a), section 506(d) has the effect of voiding a lien that exceeds the value of the allowed secured claim, i.e., the debtor's interest in the underlying collateral. *Dever*, 164 B.R. at 134–35 (collecting cases); *Johnson*, 386 B.R. at 173–74.

In *Dewsnup v. Timm*, the Supreme Court departed from this approach and held that section 506 did not apply in a Chapter 7 liquidation to strip off a lien from a family farm that was wholly "underwater" (i.e., wholly unsupported by value in the collateral). 502 U.S. 410 (1992). Examining the text of the section, the Court found ambiguity in section 506(d)'s use of the term "allowed secured claim." *Id.* at 417. Relying on a pre-Bankruptcy Code rule that "liens pass through bankruptcy unaffected," the Court found that "allowed secured claim" as used in section 506(d) did not carry the same meaning as the term in section 506(a). *Id.* Therefore, section 506(d) did not have the effect of voiding the unsecured portion of the lien after a claim was bifurcated under section 506(a). *Id.* But the Court limited its holding to the case before it, saving other cases with distinct circumstances to find their "legal resolution on another day." *Id.* at 416–17.

Some Courts have found that the Supreme Court's interpretation of section 506(d) in *Dewsnup* prohibits lien stripping outside of the Chapter 7 context. *See In re Taffi*, 144 B.R. 105, (Bankr. C.D. Cal. 1992) ("Nowhere in *Dewsnup* can I find the conclusion that 506(d) means one thing in chapter 11 and another in chapter 7."). Other courts have found the reasoning of *Dewsnup* both generally unpersuasive and, relying on the Supreme Court's own limitation of its holding, have found that sections 506(a) and 506(d) work together to permit lien stripping in cases outside of Chapter 7. *See In re Butler*, 139 B.R. 258, 259 (Bankr. E.D. Okla. 1992) ("As a result of the

17

Court's limiting language, we find the applicability of the *Dewsnup* rationale to be only in Chapter 7 liquidation cases and inapplicable to the other chapters of the Bankruptcy Code."); *Johnson*, 386 B.R. at 177–78 (concluding that lien stripping was permissible in reorganization cases notwithstanding *Dewsnup*).

Courts in this district have embraced a slightly different rationale for lien stripping in Chapter 11 cases.  In 1994, Congress amended Chapter 11 to clarify that a reorganization plan may modify the rights of secured creditors.  Bankruptcy Reform Act of 1994 § 204, 103 Pub. L. 394, 108 Stat. 4106 (Oct. 22, 1994).  It provides that a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ." 11 U.S.C. § 1123(b)(5).  Citing that provision, courts in this district have held that, under section 1123(b)(5), a confirmed Chapter 11 plan of reorganization may void the undersecured portion of a lien that has been bifurcated pursuant to section 506(a).  *See Int. Rev. Serv. v. Johnson*, 415 B.R. 159, 169–70 (W.D. Pa. 2009) ("Therefore, to strip a lien in a Chapter 11 proceeding, a court must bifurcate the lien into secured and unsecured claims under § 506(a) and then, if a debtor's plan of reorganization meets the requirements of § 1123(a), a secured claim may be modified pursuant to § 1123(b)(5)."); *In re Berkebile*, 444 B.R. 326, 330 (Barnk. W.D. Pa. 2011) (same).  The Third Circuit has approved of this practice.  *See In re Heritage Highgate, Inc.*, 679 F.3d 132, 144–45 (3d Cir. 2012) (approving of lien stripping in Chapter 11 cases pursuant to a confirmed reorganization plan).  Under these precedents, a bankruptcy court may strip down or strip off a lien, as appropriate, pursuant to a Chapter 11 plan of reorganization.

Acknowledging these precedents, the government argues that the bankruptcy court erred because Herron's reorganization Plan did not purport to alter the tax lien.  Br. of Appellant United States at 18, No. 2:21-cv-1434-RJC (ECF No. 12) ("United States' Opening Br."). The bankruptcy

court considered this argument and found that section 4.6 of the Plan anticipated that Herron's tax

debts would be affected by the adversary proceeding that lead to this appeal.  Memo. Op. at 30.

That section of the Plan provides, in part:

> The Debtor has filed the IRS Adversary Case, *seeking a determination of the secured status* and dischargeability of the IRS Claim.  However, until the IRS Adversary Case is adjudicated, the Debtor will make payments pursuant to this section as though the IRS Claim will remain unchanged through the IRS Adversary Case. Provided, however, in the first full month after the IRS Adversary Case is adjudicated, that the Debtor will recompute such payments to confirm [sic] with the outcome of the IRS Adversary Case, with any payments that the Debtor made to the Holder of an Allowed Claim in Class 6 under this Plan prior to such adjudication to be credited against the adjusted amount of such claim.

Chapter 11 Plan § 4.6 (emphasis added).  Further, Herron filed the adversary proceeding months

before the Plan was proposed and confirmed, so the possible outcomes of the proposed

modification of its lien were not a mystery to the government when the time to object came around.

As the bankruptcy court found, "[i]t is difficult to see how much more clear the Plan could have

been in putting the IRS on notice as to [Herron's] intent to modify the IRS tax lien."  Memo. Op.

at 30.

However, that conclusion does not end the analysis.  Though the bankruptcy court properly

engaged in lien stripping, the parties challenge aspects of the method that court used to value

Herron's assets and then bifurcate the government's secured claim.  Before turning to those

objections, this Court delves further into the bankruptcy court's treatment of Herron's assets and

the tax lien.

After the sale of two properties and the settlement respecting one other while Herron's

Chapter 11 case proceeded, the estate was left with five properties that are enumerated in Count's

VI, VII, VIII, X, and XI of the adversary complaint.  The bankruptcy court found that those

properties were subject to priority liens leaving the estate with equity in the properties according
to the following table:

| Count | Property | Value | Higher Priority Liens | Debtor Equity Before Considering Tax Lien |
|-------|----------|-------|----------------------|-------------------------------------------|
| VI | 155 Chesterfield, Pittsburgh, PA | $160,000 | $164,813.29 | $0 |
| VII | 237 Chesterfield, Pittsburgh, PA | $145,000 | $113,609.89 | $31,390.11 |
| VIII | 145 Chesterfield, Pittsburgh, PA | $160,000 | $92,720.60 | $67,279.40 |
| X | 1132 SE Kings Bay Dr., Crystal River, FL | $525,000 | $544,722.02 | $0 |
| XI | 731 Rosedale, Annapolis, MD | $375,000 | $390,203.90 | $0 |

Memo. Op. at 27.  If that were the end of it, Herron would have been left with a total of $98,669.51
in equity in two of the Chesterfield Road properties.

However, all three of Chesterfield Road properties were subject to the same higher priority
$92,720.60 claim from Nextier Bank.  *Id.*  The bankruptcy court found that applying the full value
of Nextier's claim to each of the three properties gave a false impression of Herron's equity.  *Id.*
at 37.  To solve that problem, the bankruptcy court determined that it could treat the Chesterfield
Road properties as a unit for purposes of determining Herron's remaining equity.  *Id.* at 37–38.
And, counted together, the Chesterfield Road properties were worth $465,000 and subject to
$185,702.58 in higher priority liens, leaving Herron with $279,297.42 in equity in all three before
the tax lien.  *Id.*

Because the Florida and Maryland properties were subject to higher priority liens
exceeding their value, the bankruptcy court determined that the tax lien could be stripped off those
properties.  *Id.* at 38.  But Herron had $279,297.42 in equity remaining in the Chesterfield Road
properties.   Accordingly,  the  bankruptcy  court  bifurcated  the  government's  secured  claim

20

(approximately $518,000) pursuant to section 506(a), and then stripped the lien securing that claim down to the value of Herron's equity in the Chesterfield Road properties. *Id.* at 37–38. That left the government with a lien on the Chesterfield Road properties of only $279,297.42. *Id.* at 38.

Back to the parties' objections. Herron objects to the bankruptcy court's treatment of the Chesterfield Road properties as a unit. He argues that the bankruptcy court's decision subjects each of those properties, individually, to a tax lien in an amount exceeding their value. Herron's Opening Br. at 16–17. And, based on precedent allowing the IRS to seize a property subject to a tax lien even after sale to a bona fide purchaser, the lien on the Chesterfield Road properties "makes it exceedingly unlikely that an informed buyer would purchase" them. *Id.* (citing *United States v. Avila*, 88 F.3d 229, 233 (3d Cir. 1996)). That practical limit on the properties' disposition, Herron says, interferes with the bargained-for-collateral of Nextier and Wells Fargo, each of which holds a higher-priority claim on the Chesterfield Road properties. *Id.*

For its part, the government approves of the Court's collective treatment of the Chesterfield Road properties. United States' Opening Br. at 27. But, it explains, the tax lien is a blanket lien on *all* property interests that a taxpayer has; it is not a lien on any one piece of collateral. *Id.* at 25–26. The government objects to the bankruptcy court's exclusion of the value of any personal property in Herron's estate from its analysis of the secured status of the IRS's lien. *Id.* at 26–27.

Recall that the tax code grants the IRS an exceedingly broad lien; that lien extends to "all property and rights to property, whether real or personal, belonging to" a tax debtor, without limitation. 26 U.S.C. § 6321. The Supreme Court has recognized that this language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719–20 (1985). A federal tax lien

is thus secured, not by a single asset or even a single class of assets, but by the total value of all the debtor's assets.

Here, the bankruptcy court's opinion includes no mention of personal property. The Court limited its analysis of the secured status of the government's lien to the value of the equity remaining in the properties that Herron identified in his complaint. That analysis of the tax lien excluded the value of Herron's interest in personal property. The government contends that there was significant value in personal property in the estate and that the estate's total value far exceeded the full value of the government's secured claim. United States' Opening Br. at 26.[3] The bankruptcy court erred by failing to consider additional sources of value in the estate. Accordingly, the Court will remand the case for a determination of the status of the IRS's secured claim with a full accounting of the value in Herron's estate.

The government also argues that the Plan could not have sanctioned the relief granted by the bankruptcy court. It explains that, if the relief ultimately granted had been part of the Plan, then the Plan would have violated three cardinal rules of Plan confirmability under Chapter 11: the absolute priority rule; the best interests test, and the fair and equitable rule. But its arguments respecting these cardinal rules all rest on the premise that the bankruptcy court undervalued the collateral securing the IRS's lien by excluding personal property in the estate. Because the Court remands the case with instructions to consider any and all value in determining whether stripping

---

[3] The chart submitted by the government includes the two properties (on Roup Avenue and Orpwood Street) that were sold during the Chapter 11 proceeding. *See* United States' Opening Br. at 26; Memo. Op. at 4. The bankruptcy court had previously approved the sales and, by order, transferred the IRS's liens on those properties to the proceeds of the sales. Memo. Op. at 4. The government did not challenge those sales or transfers. The bankruptcy court determined that the claims concerning those properties were moot but invited filings respecting the disposition of the sale proceeds. Memo. Op. at 39 n.16. Those proceeds should be considered part of the estate for purposes of assessing Herron's remaining interest and, consequently, the status of the IRS's secured claim.

the government's lien is appropriate, the Court does not further address the application of these cardinal rules or otherwise address the confirmability of the Plan.[4]

Finally, the government objects that its tax lien could not be stripped to the extent that it secured a nondischargeable debt. United States' Opening Br. at 29. The Court has already concluded that the bankruptcy court correctly determined that Herron's tax debts were nondischargeable because he attempted to willfully evade paying his taxes. The government cites a number of cases holding that a finding that a debt is not dischargeable precludes the modification of a lien securing that debt. *Id.* (collecting cases).

In *Blendheim*, the Ninth Circuit explained that a discharge of a debt is not a prerequisite to the stripping of a lien securing that debt because a discharge affects only the personal liability of the debtor:

> Fundamentally, a discharge is neither effective nor necessary to void a lien or otherwise impair a creditor's state-law right of foreclosure. As defined under the Bankruptcy Code, a "discharge" operates as an injunction against a creditor's ability to proceed against a debtor personally. Discharges leave unimpaired a creditor's right to proceed *in rem* against the debtor's property. It follows logically

---

[4] It is possible that the government forfeited these arguments when it failed to object to the Plan. A confirmed Plan is a final judgment and has *res judicata* effect on arguments that could have been raised prior to confirmation. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (finding that an order confirming a plan bound a party that failed to object despite the bankruptcy court's confirmation of the plan in violation of other provisions of the Bankruptcy Code). The government could have objected to the Plan on the grounds that the relief sought by Herron might violate these cardinal rules. After all, it had notice of the adversary proceeding and the Plan prospectively incorporated the results of the adversary proceeding in clear terms.

The government may have chosen not to object out of a belief that it would prevail on the lien stripping issue in the bankruptcy proceeding. Or it may have believed that the bankruptcy court's final decision would not cross these cardinal lines. At first blush, none of those reasons seems to excuse the government's failure to object. However, the Court need not reach the issue because it remands the case for a determination of the full property value in Herron's estate. It may be that the bankruptcy court's final decision on remand does not toe the cardinal lines. If the government believes that it does, the Court will consider the *res judicata* argument in the ensuing appeal.

that there is no reason to make the Bankruptcy Code's *in rem* modification or voidance provisions contingent upon a debtor's eligibility for a discharge, when discharges do not affect *in rem* rights.

*In re Blendheim*, 803 F.3d 477, 493–94 (9th Cir. 2015) (citations omitted). *See also* 11 U.S.C. § 524(a)(2) (a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor"). Neither section 506(a) nor section 1123(b)(5) condition the stripping or modification of a lien on the dischargeability of the underlying debt. Given that a discharge does not affect a creditor's *in rem* rights, and given the lack of any textual hook for a discharge as a prerequisite to lien stripping, the Court is persuaded that a discharge is not required before a lien securing a debt is stripped. Consequently, the nondischargeability of Herron's tax debts did not prevent the bankruptcy court from engaging in lien stripping pursuant to the Plan.

## IV.     CONCLUSION

For the foregoing reasons, the judgment of the bankruptcy court will be affirmed in part and reversed in part. The case will be remanded for further proceedings consistent with this opinion. An appropriate order follows.

BY THE COURT:

*/s/Robert J. Colville*_____
Robert J. Colville
United States District Judge

DATED: February 9, 2024
cc: All counsel of record

24

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 2:21-cv-1434-RJC |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| MICHAEL K. HERRON, | ) | |
| | ) | |
| Appellee. | ) | |

| | | |
|---|---|---|
| MICHAEL K. HERRON, | ) | |
| | ) | No. 2:21-cv-1435-RJC |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee. | ) | |

## <u>ORDER</u>

AND NOW this 9th day of February 2024, it is HEREBY ORDERED that the October 5,

2021 Judgment Order of the Bankruptcy Court entering judgment in favor of the Creditor the

United States of America in part and in favor of Debtor Michael K. Herron in part is hereby

affirmed in part and reversed in part, consistent with the Opinion of this Court entered on this date.

It is FURTHERED ORDERED that these cases are remanded to the Bankruptcy Court for further

proceedings consistent with the Opinion of this Court entered on this date.

BY THE COURT:

*/s/Robert J. Colville_____*
Robert J. Colville
United States District Judge

DATED: February 9, 2024
cc: All counsel of record

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 2:21-cv-1434-RJC |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| MICHAEL K. HERRON, | ) | |
| | ) | |
| Appellee. | ) | |

---

| | | |
|---|---|---|
| MICHAEL K. HERRON, | ) | |
| | ) | No. 2:21-cv-1435-RJC |
| Appellant, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee. | ) | |

## JUDGEMENT ORDER

AND NOW this 9th day of February 2024, for the reasons set forth in the Opinion and Order filed on this date, Judgment is hereby entered in favor of the United States of America in part and against Michael K. Herron in part. These cases are remanded to the Bankruptcy Court for further disposition consistent with the Opinion and Order. These cases shall be closed.

BY THE COURT:

/s/Robert J. Colville
Robert J. Colville
United States District Judge

DATED: February 9, 2024
cc: All counsel of record